**UNITED STATES of America, Plaintiff–Appellee,**

v.

**Vincent COOKE, Defendant–Appellant.**

**No. 89–2261.**

United States Court of Appeals, Sixth Circuit.

Submitted Aug. 3, 1990.

Decided Oct. 1, 1990.

Yvonne V. Watford, Office of the U.S. Atty., Detroit, Mich., for plaintiff-appellee.

Cornelius Pitts, Detroit, Mich., for defendant-appellant.

Before MILBURN and GUY, Circuit Judges, and JORDAN, District Judge.*

RALPH B. GUY, Jr., Circuit Judge.

Defendant, Vincent Cooke, entered a conditional guilty plea to a one-count indictment charging possession with intent to distribute cocaine, 21 U.S.C. § 841(a)(1). Prior to entering the plea, Vincent had filed a motion to suppress evidence, which was denied.

Upon a review of the record of the suppression hearing, we conclude that the district judge correctly denied the motion, and we affirm on the basis of Judge Zatkoff's written opinion.

## I.

This is an airport search case. Cooke arrived in Detroit, Michigan, on an airplane that had flown non-stop from New York's LaGuardia Airport. Sgt. Jeriel Heard of

presented to the district court. *Sigmon Fuel Co. v. TVA,* 754 F.2d 162, 164–65 (6th Cir.1985).

---

* Honorable Leon Jordan, United States District Court for the Eastern District of Tennessee, sitting by designation.

the Wayne County Sheriff's Department, who is assigned to the airport drug task force, was monitoring this particular flight since New York is a source city of drugs coming into the Detroit area. Heard's attention was initially directed at Cooke because Heard observed that one of Cooke's two pieces of carry-on luggage had attached to it what appeared to be a new Greyhound bus luggage tag. Heard knew that drug couriers often used multiple forms of transportation when travelling to and from source cities. Cooke also appeared to be nervous and conducting counter-surveillance.

We do not dwell on the details of what Heard initially observed because we do not view this as a "profile" case, and we do not believe that Heard had the necessary reasonable suspicion to make a *Terry* stop.[1] In any event, Heard followed Cooke, and when he saw that he was claiming no baggage, he radioed for another officer to assist in surveillance. Cooke left the terminal and then, appearing increasingly nervous, returned and made a quick telephone call. Upon the completion of the call, he hurriedly exited the terminal, at which point the two officers approached him, identified themselves, and asked if they could speak with him. Cooke agreed. The officers were dressed in plain clothes, and there was no show of weapons, use of force, or other coercive conduct.

Cooke further agreed, upon inquiry, to produce his airline ticket and identification, and the agents noticed his hands trembling as he did so. The ticket was one-way from New York to Detroit. Since Cooke had an Ohio driver's license, he was asked why he had come to Detroit, and he replied that he was going to Toledo, Ohio, to visit a friend. The documents were returned to Cooke after perusal.

Heard then explained that he was part of a group assigned to the airport to enforce the drug laws and asked if he could search Cooke's carry-on luggage. Cooke replied, "Yes. Go ahead and search."[2] Since they were outside on the sidewalk at this time, Heard asked if Cooke would rather have the search there or inside the terminal, and Cooke indicated he would prefer to go inside. Cooke then picked up his luggage and accompanied the agents to a luggage conveyor belt just inside the terminal. Heard again asked Cooke if he could search the luggage, and again Cooke consented. The search revealed five kilograms of cocaine in Cooke's carry-on bag.

## II.

In one of our very recent airport search cases, we make the following observation:

From the plethora of airport search cases now reported, it is clear that there are three distinct types of contact that occur between police officers and the travelling public. The first is contact initiated by a police officer without any articulable reason whatsoever. This contact and its consequences are referenced in *Florida v. Royer*, 460 U.S. 491, 497, 103 S.Ct. 1319, 1324, 75 L.Ed.2d 229 (1983), as follows:

[L]aw enforcement officers do not violate the Fourth Amendment by merely approaching an individual on the street or in another public place, by asking him if he is willing to answer some questions, by putting questions to him if the person is willing to listen, or by offering in evidence in a criminal prosecution his voluntary answers to such questions. See *Dunaway v. New York, supra,* [442 U.S. 200] at 210, n. 12 [99 S.Ct. 2248, at 2255, n. 12, 60 L.Ed.2d 824 (1979)]; *Terry v. Ohio,* 392 U.S. at 31, 32–33, 88 S.Ct. at 1885, 1885–86 (Harlan, J., concurring); *id.,* at 34, 88 S.Ct. at 1886 (WHITE, J. concurring). Nor would the fact that the officer identifies himself as a police officer, without more, convert the en-

---

1. *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968).

2. At the suppression hearing Cooke denied voluntarily consenting to the search but the district judge credited the officer's version of what occurred, and we are unable to say that this credibility finding was clearly erroneous.

counter into a seizure requiring some level of objective justification. *United States v. Mendenhall,* 446 U.S. 544, 555, 100 S.Ct. 1870, 1877, 64 L.Ed.2d 497 (1980) (opinion of Stewart, J.). *See also United States v. Collis,* 699 F.2d 832, 834–35 (6th Cir.), *cert. denied,* 462 U.S. 1119, 103 S.Ct. 3088, 77 L.Ed.2d 1349 (1983).

The second type of contact is that predicated upon "reasonable suspicion" —the classic *Terry* stop. The temporary detention of a person meeting the drug courier profile would be an example of this type of police-citizen contact which, although constituting a seizure, would not offend the fourth amendment.

The third type, seldom found in the context of airport cases insofar as the initial contact is concerned, is when the officers have probable cause to believe a crime has been committed and that the person stopped committed it. In such situations the seizure may, in fact, be an arrest.

*United States v. Flowers,* 909 F.2d 145, 147 (6th Cir.1990) (footnote omitted).

Stated another way, cases like the one involving this defendant are going to turn largely on credibility determinations made by the district judge at the suppression hearing. This was a permissible police-citizen contact insofar as the initial encounter was concerned, followed by a consent to search. We conclude that, in the interval between the initial contact and the consent to search, a reasonable person would not have felt that he was being detained. Thus, there was no seizure.

While the test is flexible enough to be applied to the whole range of police conduct in an equally broad range of settings, it calls for consistent application from one police encounter to the next, regardless of the particular individual's response to the actions of the police. The test's objective standard—looking to the reasonable man's interpretation of the conduct in question—allows the police to determine in advance whether the conduct contemplated will implicate the Fourth Amendment. This "reasonable person" standard also ensures that the scope of the Fourth Amendment protection does not vary with the state of mind of the particular individual being approached.

*Michigan v. Chesternut,* 486 U.S. 567, 574, 108 S.Ct. 1975, 1979–80, 100 L.Ed.2d 565 (1988) (citation omitted).

In reaching the conclusion that we do, we wish to stress two points that are important to the analysis of these airport cases. First, since credibility is a key issue, it would be helpful if district judges or magistrates conducting suppression hearings would indicate why they are crediting one party over another when the versions of what occurred differ in material detail. Similarly, the party attacking the judicial officer's credibility determination must do more than just allege that the parties told conflicting stories. An effort must be made to demonstrate why the trial court's conclusion is clearly erroneous. On appeal all we have is the cold record, and we accord considerable deference to the credibility findings of the trial court.

Second, where voluntary consent to search is alleged by the government, it is important to remember that the government bears the burden of proof on this issue, and that the consent must be unequivocal and intelligently given, untainted by duress or coercion. *United States v. McCaleb,* 552 F.2d 717, 721 (6th Cir.1977).

In sum, we conclude, as did the district judge, that no seizure occurred prior to a voluntary consent to search being given by the defendant.

AFFIRMED.